1  Marc G. Reich (SBN 159936)
   Email: mgr@reichradcliffe.com
2  Adam T. Hoover (SBN 243226)
   Email: adhoover@reichradcliffe.com
3  REICH RADCLIFFE & KUTTLER LLP
   4675 MacArthur Court, Suite 550
4  Newport Beach, CA 92660
   Phone:  (949) 975-0512
5  Facsimile: (949) 208-2839

6  Joshua M. Lifshitz (*Pro Hac Vice to be submitted*)
   jml@jlclasslaw.com
7  LIFSHITZ & MILLER
   821 Franklin Ave., Suite 209
8  Garden City, NY 11530
   Telephone: (516) 493-9780
9  Facsimile: (516) 280-7376

10 Attorneys for Plaintiff
   SHELDON SCHWARTZ, Derivatively On Behalf of
11 Nominal Defendant NIMBLE STORAGE

12                  **UNITED STATES DISTRICT COURT**

13                **NORTHERN DISTRICT OF CALIFORNIA**

14

15 SHELDON SCHWARTZ, Derivatively On Behalf       Case No: 5:16-CV-00892
   of Nominal Defendant NIMBLE STORAGE

16              Plaintiff,

17 v.                                             **SHAREHOLDER DERIVATIVE ACTION**
                                                  **FOR BREACH OF FIDUCIARY DUTY**
18 SURESH VASUDEVAN, VARUN MEHTA,
   FRANK CALDERONI, JAMES J. GOETZ,
19 WILLIAM D. JENKINS, JR., JERRY M.              **Demand for Jury Trial**
   KENNELLY, PING LI, WILLIAM J.
20 SCHROEDER, ANUP V. SINGH, DANIEL T.
   LEARY, UMESH MAHESHWARI,
21
                Defendants,
22 and,

23 NIMBLE STORAGE, INC.,

24              Nominal Defendant.

25

26

27

28

Plaintiff Sheldon Schwartz ("Plaintiff") by and through his undersigned attorneys, brings this shareholder derivative action for the benefit of Nominal Defendant, Nimble Storage, Inc. ("Nimble Storage" or the "Company"), against certain members of its Board of Directors (the "Board") and/or executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties from May 27, 2015 continuously to date (the "Relevant Period").  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Nimble Storage and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Nimble Storage's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action lawsuits titled *Madhani v. Nimble Storage, Inc. et al.*, 4:16cv629 (N.D. Cal. Feb. 5, 2016), *Guardino v. Nimble Storage, Inc. et al.*, 3:15cv5991 (N.D. Cal. Dec. 23, 2015), and *Vikramkumar v. Nimble Storage, Inc. et al.*, 4:15cv5803 (N.D. Cal. Dec. 17, 2015); and (e) review of other publicly available information concerning Nimble Storage and the Defendants.

## SUMMARY OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Nimble Storage's Board and/or certain of the Company's executive officers regarding false and misleading statements made by the Company in its financial reports filed with the SEC during the Relevant Period.

2.     Nimble Storage is in the business of providing flash storage solutions in order for businesses to consolidate workloads and improve storage capacity while reducing storage silos.

3.     The Company traditionally focused on and sold its products to small and medium-sized customers in the U.S. Commercial market, experiencing significant success via that channel for many years since the Company was incorporated in 2007.

4.      Although the Company experienced success in the U.S. Commercial market and first developed products to be used by small and medium-sized IT operations, the Company decided to refocus its main target market and in October 2014, the Company introduced its Fibre Channel products that were designed to compete for the business of Large Enterprises.

5.      Nimble Storage was negatively impacted and unable to compete with large competitors in the Large Enterprise sales channel.  Large competitors sought to retain their business in the Large Enterprise channel and reduced prices for their products significantly in order to maintain market share.  As a result of the intense price competition, the Company lost sales in the U.S. Commercial channel and the Large Enterprise channel.

6.      However, throughout the Company's fiscal year 2016, Defendants maintained, through public filings, that the Company was succeeding in competing against large competitors and increasing its sales to Large Enterprises.

7.      The statements made by Defendants concerning the Company's financial results for the first and second fiscal quarters of 2016, detailed herein, were false and misleading because Defendants failed to disclose material adverse information about the Company to the investing public through the Company's public filings, which was known by Defendants.

8.      On November 19, 2015, the truth about the Company's false and misleading filings was revealed and the Company's stock price plummeted after the Defendants' false and misleading statements became public knowledge, including that Nimble Storage: (i) was being negatively impacted by intense competition from established, large competitors who were reducing prices in order to maintain market share for Large Enterprises; (ii) had made a conscious decision to focus its sales and marketing efforts towards the Large Enterprises market and to reduce sales efforts in the U.S. commercial market; and (iii) was losing sales in both sales channels due to this change in sales strategy and intense price competition.

9.      One day later, on November 20, 2015, the Company's stock dropped approximately 51% from the day before, to close at $10.05 per share.

10.     While the investing public was harmed from the Company's stock price plummeting, certain of the Defendants benefited from inflated stock price of the Company throughout the Relevant

Period.  Defendants Vasudevan, Mehta, Li, Kennelly, Leary, Singh and Maheshwari each sold shares of their Nimble Storage stock, reaping approximately $31.4 million in total proceeds during the Relevant Period, after the false and misleading statements were issued and before the truth was revealed.

11.    As a result of the Defendants false and misleading statements, Nimble Storage has been and will continue to be harmed.  The Company has lost significant sales in its traditional U.S. Commercial channel and large competitors have made it so that the Company will continue fail in trying to competitively price its products for the Large Enterprises.

<strong>JURISDICTION AND VENUE</strong>

12.    This Court has jurisdiction over each of the Defendants because they conduct business in, reside in, and/or are citizens of California.  Nominal Defendant Nimble Storage is a citizen of California as it has its principal place of business located at 211 River Oaks Parkway, San Jose, California 95134.  This Court has jurisdiction pursuant to 28 U.S.C. §1332 in that there is complete diversity between the parties and the matter in controversy exceeds $75,000.

13.    Venue is proper in this County because the acts, practices, and transactions pleaded herein occurred and were affected to a major extent within this County, Nimble Storage maintains executive offices in this District, and the Director-Defendants have received substantial compensation in this District by doing business and engaging in numerous activities that had an effect in this District.

<strong>THE PARTIES</strong>

14.    Plaintiff Sheldon Schwartz is and has continuously been the owner of Nimble Storage shares since October 2014 and throughout all relevant times alleged herein.  Plaintiff is a citizen of Massachusetts.

15.    Nominal Defendant Nimble Storage is a Delaware corporation with its principal place of business located at 211 River Oaks Parkway, San Jose, California 95134.

16.    Defendant Suresh Vasudevan ("Vasudevan") has been a director of the Company since September 2009, the Chief Executive Office ("CEO") since March 2011, and the Chairman of the Board since September 2013. For the years January 31, 2015 and 2014, Defendant Vasudevan

received $6,847,985 and $6,571,822 in total compensation[1], respectively. Upon information and belief, Defendant Vasudevan is a citizen of California.

17.     Defendant Varun Mehta ("Mehta") has been a director of the Company since November 2007 and the Company's Vice President of Engineering since March 2011.   Defendant Mehta was the founding CEO of Nimble Storage and served as the CEO until March 2011.  For the years ended January 31, 2015 and 2014, Defendant Mehta received $12,465,372 and $753,703 in total compensation, respectively.  Defendant Mehta has been a limited Partner at Accel Growth Fund II Strategic Partners L.P., an entity affiliated with Accel Partners, since prior to the time of the Company's initial public offering ("IPO") on December 12, 2013.  Upon information and belief, Defendant Mehta is a citizen of California.

18.     Defendant Ping Li ("Li") has been a director of the Company since March 2011 and is a member of the Compensation Committee and the Nominating and Corporate Governance Committee. As of the 2014 Proxy Statement[2], Defendant Li was the beneficial owner of 12,940,220 shares in Nimble Storage, representing 18% of the Company's outstanding shares, because of his position as a Managing Member at Accel Partners, a venture capital firm.  Defendant Li's principal occupation is his role as a Partner at Accel Partners, where he is also a Managing Member of several entities affiliated with Accel Partners.  Defendant Li has been employed at Accel Partners since 2004.  Upon information and belief, Defendant Li is a citizen of California.

19.     Defendant Jerry M. Kennelly ("Kennelly") has been a director of the Company since March 2013 and is the Lead Independent Director.  Defendant Kennelly is the General Partner of Kennelly Partners, L.P. ("Kennelly Partners"), which is a limited Partner in Accel Growth Fund II Strategic Partners L.P. and Accel IX Strategic Partners L.P., entities affiliated with Accel Partners. Kennelly Partners is also a limited Partner in Lightspeed Venture Partners VIII, L.P. ("Lightspeed"), a venture capital firm and initial investor in Nimble Storage since prior to and continuing through the Company's IPO.  Before the Company's IPO, as detailed in Nimble Storage's Form S-1, filed with the

---

[1] For executive officers, "total compensation includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

[2] Schedule 14A, filed on May 30, 2014 (the "2014 Proxy").

SEC on October 18, 2013, Lightspeed owned approximately 15.8% of the Company.  Upon information and belief, Defendant Kennelly is a citizen of New York.

20.     Defendant Frank Calderoni ("Calderoni") has been a director of the Company since June 2012 and is the Chairman of the Audit Committee and a member of the Compensation Committee. Upon information and belief, Defendant Calderoni is a citizen of California.

21.     Defendant James J. Goetz ("Goetz") has been a director of the Company since December 2007 and is the Chairman of the Compensation Committee.  Defendant Goetz has been a Managing Member of Sequoia Capital Operations, LLC ("Sequoia"), a venture capital firm and initial investor in Nimble Storage, since June 2005.  As of the 2014 Proxy, Defendant Goetz beneficially owned 12,940,218 shares of Nimble Storage because he is a Managing Member of entities affiliated with Sequoia.  Upon information and belief, Defendant Goetz is a citizen of California.

22.     Defendant William D. Jenkins, Jr. ("Jenkins") has been a director of the Company since March 2015 and is a member of the Audit Committee.  Upon information and belief, Defendant Jenkins is a citizen of California.

23.     Defendant William J. Schroeder ("Schroeder") has been a director of the Company since April 2013 and is a member of the Audit Committee and the Chairman of the Nominating and Corporate Governance Committee.  Upon information and belief, Defendant Schroeder is a citizen of California.

24.     Defendant Anup V. Singh ("Singh") has been been the Chief Financial Officer ("CFO") of the Company since November 2011.  Upon information and belief, Defendant Singh is a citizen of California.

25.     Defendant Daniel T. Leary ("Leary") has been the Vice President of Marketing since May 2008.  Upon information and belief, Defendant Leary is a citizen of California.

26.     Defendant Umesh Maheshwari ("Maheshwari") is also a founder of the Company along with Defendant Mehta and has been the Chief Technology Officer of Nimble Storage since November 2007.  For the Company's fiscal year ended January 31, 2015, Defendant Maheshwari received

$12,465,372 in total compensation.  As of the 2015 Proxy Statement[3], Defendant Maheshwari beneficially owned 5,522,401 shares, approximately 7.1%, of the Company's outstanding stock.  Upon information and belief, Defendant Maheshwari is a citizen of California.

27.    Defendants Vasudevan, Mehta, Calderoni, Goetz, Jenkins, Kennelly, Li and Schroeder are collectively referred to hereinafter as the "Individual Defendants."

28.    The Individual Defendants and Defendants Singh, Leary, and Maheshwari are collectively referred to hereinafter as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

29.    Nimble Storage provides flash-optimized storage platforms and software that handle various mainstream applications, including virtual desktops, databases, email, collaboration, and analytics.  Nimble Storage has over 6,200 customers in 50 countries as of August 2015 and in the past 12 months, the Company has added more than 2,460 new customers, and the average deal size has continued to increase.  The Company sells its products through three main distribution channels: (i) U.S. Commercial (small to medium sized operations, representing the majority of the Company's sales); (ii) Large Enterprises; and (iii) international sales.

30.    For years, the Company developed its CS210 and CS215 products specifically for small to medium-sized IT organizations or remote offices.  The CS210 and CS215 products support iSCSI (Internet Small Computer System Interface) storage protocol and were designed for small to medium-sized IT organizations or remote offices.

31.    The Company incorporated in 2007 and its first product line, the CS200 series which was designed specifically for small to medium-sized IT organizations or remote offices, was shipped in August 2010 for use by customers.  The Company experienced rapid success selling its CS200 series in the smaller and medium U.S. Commercial channels.

### The Company Changes its Sales Strategy

---

[3] Schedule 14A, filed on May 29, 2015 (the "2015 Proxy").

32.     During October 2014, the Company introduced its Fibre Channel products – CS300, CS500 and CS700 series products – that were designed to compete for the business of Large Enterprises.

33.     As a result of the Company switching gears away from its traditional smaller and medium sales channels that had provided the Company so much success from its first product launch in August 2010, Nimble Storage was negatively impacted and unable to compete with large competitors in the Large Enterprise sales channel.  Large competitors slashed prices in order to maintain their market share and as a result of the intense price competition, the Company lost sales in its traditional U.S. Commercial market channels.

34.     As a result of the Company switching gears away from its traditional smaller and medium sales channels that had provided the Company so much success from its first product launch in August 2010, Nimble Storage was negatively impacted and unable to compete with large competitors in the Large Enterprise sales channel.  Large competitors slashed prices in order to maintain their market share and as a result of the intense price competition, the Company lost sales in its traditional U.S. Commercial market channels.

**Nimble Storage Announces First Quarter 2016 Results**

- *Strong First Quarter Revenue Up 53% year-over-year to $71.3M; Record Non-GAAP Gross Margins of 67.6%*
- *Continued Success in Customer Acquisition with 5,521 Total Customers*
- *Large Deals >$100k Grew at Record 142% year-over-year*
- *Enterprise and Service Provider Bookings > 100% year-over year*
- *Fibre Channel Product Adoption Continues; 14% of Total Bookings up from 10% in Q4FY15*

\*      \*      \*

**Financial Highlights:**

- Total revenue increased 53% to $71.3M, up from $46.5M in the first quarter of fiscal 2015. Excluding fluctuations in foreign currency, revenue would have been $73.4M representing a 58% increase over first quarter of fiscal 2015.

- Non-GAAP gross margin for the first quarter of fiscal 2016 was 67.6% compared to 66.2% in the first quarter of fiscal 2015.

- Non-GAAP operating loss was $7.9M or negative 11% of revenue for the first quarter of fiscal 2016, compared to a loss of $10.1M or negative 22% of revenue in the first quarter of fiscal 2015.

- GAAP net loss for the first quarter of fiscal 2016 was $29.0 million, or $0.38 per basic and diluted share, compared with a net loss of $19.6 million, or $0.28 per basic and diluted share in the first quarter of fiscal 2015.

- Non-GAAP net loss for the first quarter of fiscal 2016 was $8.0 million, or $0.10 per basic and diluted share, compared with a net loss of $10.0 million, or $0.14 per basic and diluted share in the first quarter of fiscal 2015.

**Forward Outlook:**

Nimble Storage provides guidance based on current market conditions and expectations. For the second quarter of fiscal 2016, Nimble Storage expects:

- Total revenue in the range of $77.0 to $79.0 million

- Non-GAAP operating loss in the range of $8.0 to $9.0 million

Non-GAAP net loss per basic and diluted share in the range of $0.11 to $0.12 based on weighted average basic shares outstanding of approximately 78.0 million

35.    In the May 26, 2015 press release, Defendant Vasudevan stated:

As enterprises aim to consolidate storage infrastructure to contain cost and complexity, while still delivering tailored service levels for hundreds of business enabling applications, we believe that we stand alone in our ability to address the broadest spectrum of requirements among next generation flash-optimized storage platforms. Our Q1 results serve as evidence of our continued momentum. During the quarter, we added 542 new customers, more than doubled our bookings from enterprise and service provider customers, and achieved record bookings contribution from current customers expanding their Nimble installations.

36.    In connection with the May 26, 2015 press release and on the same day, Defendant Vasudevan, the Company's CEO, and Defendant Singh, the Company's CFO, held an earnings conference call with analysts and investors.  Defendant Vasudevan stated, in pertinent part:

During Q1, we maintained our momentum of driving new customer acquisitions as we added 542 new customers, to end with an installed base of 5,521 customers. Our channel relationships have been key to our ability to add new customers. In the US, our channel programs have been focused on enablement of existing partners, even as we continue to focus on partner recruitment in international markets. This is yielding strong results as the number of new customers we added where our channel partners are playing the lead role reached record levels during Q1.

A key highlight of Q1 is the strong momentum that we saw with large deals. Bookings from deals over $100,000 grew at 142% compared to Q1 last year. And bookings from deals over $250,000 more than quadrupled compared to Q1 of last year. A major driver of the growth in

large deals is the momentum we are seeing in penetrating large enterprises. Our bookings from the enterprise segment more than doubled during Q1 on a year-over-year basis, with dozens of significant enterprise wins.

\*      \*      \*

As anticipated, our Fibre Channel product is helping to drive our enterprise adoption as it is breaking down barriers to adoption within large enterprises. And it's driving much larger deal sizes on average. During Q1, Fibre Channel accounted for 14% of our total bookings.

37.    Also during the investor conference call on May 26, 2015, Defendant Singh stated:

We are pleased with the progress we're making in our business model, and our strategy is to continue to drive strong growth in the top line along with improved leverage in the bottom line. We remain on track to achieve our goal of breakeven non-GAAP operating income at the end of FY16.

38.    During the May 26, 2015 conference call, investors and analysts began questioning the Company's decision to compete for the business of Large Enterprises and Defendant Vasudevan, responding to questions regarding the Company's sale strategy, stated, in pertinent part:

Katy, I would say the top priorities for Denis are no different than the top priorities that we as an organization have been executing to. It's really threefold, the first one being drive growth in large enterprise and cloud service providers as a component of our total business.

Second, even as we do that, make sure that we are continuing to drive customer acquisition at a rapid pace by leveraging our channel partners. And third is continue to grow our international footprint. What comes in to help our growth if we do these three things well is the fact that the loyalty that we see within our customer base drives up overall growth from existing customers. So, it's really very simple. That's what we have been executing to.

\*      \*      \*

AARON RAKERS, ANALYST, STIFEL NICOLAUS: Yes, thanks for taking the questions and congratulations on the quarter. I want to go back to Brian's question. Last quarter you talked about 83 customers deploying Fibre Channel, I think 70% of which were new. I think when you had launched the Fibre Channel product you talked about a 4X expansion in your addressable market opportunity.

What I'm hearing now it seems like we shouldn't necessarily look at it that way. It seems like the protocol isn't as important. And I'm just trying revenue it would look like your iSCSI revenue growth has slowed a bit.

I just want to be a little bit more clear. Is that -- we shouldn't care as much about the protocol? Or is it all about sales capacity and these guys are focused on Fibre Channel today? I'm just trying to understand the context of that a little bit better.

SURESH VASUDEVAN: Sure. No, absolutely. Let me start by saying when I said the protocol is not a fundamental part of the conversation, if we didn't have Fibre Channel it would be the reason why we did not win many of our enterprise deals. So in that sense, Fibre Channel absolutely expanded our TAM. It's absolutely helping us land major enterprise wins. It's helping us land larger deals that we otherwise would not have won.

Even this quarter more than 70% of our Fibre Channel customers were new to Nimble customers. So, that part remains very much true: the protocol is extremely important in that without it we cannot sell to our customers.

Having the protocol itself is not enough to win. It goes back to the fundamentals of our platform and our value proposition. That's what we win on the strength of once we have the protocol.

Now, the second part of your question was how should we think about Fibre Channel and relative to iSCSI. I'll go back to what I said which is, given a certain number of sales reps, the way to think about Fibre Channel is they are now able to work on larger deals than they would have been able to do with iSCSI alone, and the win rates are higher. So, given a fixed number of sales reps, the number of deals they can do is slightly larger and the size of the deals is larger. And that's what's driving our growth.

But to think that all the Fibre Channel deals are on top of all of the other deals that they would have otherwise done, would be a [faulity]. So, the way to think about it is it's allowing us to get more productive and it's allowing us to keep investing in sales capacity such that the more reps we have the more we are able to drive bookings, if you will.

AARON RAKERS: So, put another way, there's opportunities in iSCSI that aren't necessarily being fulfilled because they're focused on Fibre Channel.

SURESH VASUDEVAN: That's right. The way to think about it is there are opportunities in iSCSI that are not being able to be fulfilled, there are opportunities in Fibre Channel that we won't get to until we keep adding sales capacity over time. And the way we think about sales capacity, every quarter we add a certain number of sales reps, but we only add so many such that we can still drive operating leverage and drive growth over time rather than short-term growth by just overloading on the number of sales reps we have on our books, if you will.

39.    On May 26, 2015, the Company's stock price closed at $25.40 per share.

40.    On August 25, 2015, in a press release, the Company announced its financial results for the second quarter of 2016 for the period ended July 31, 2015.  The press release stated, in pertinent part:

**Nimble Storage Announces Second Quarter 2016 Results**

- *Strong Second Quarter Revenue Up 49% year-over-year to $80.1M*
- *Record Non-GAAP Gross Margins of 67.8%*
- *Record Cash Flow from Operations of $14.9M and Free Cash Flow of $9.0M*
- *Record Customer Growth with 690 new customers totaling 6,211*
- *Number of Deals > $100k at Record High*

\*      \*      \*

**Financial Highlights:**

- Total revenue increased 49% to $80.1 million, up from $53.8 million in the second quarter of fiscal 2015. Excluding fluctuations in foreign currency, revenue would have been $82.8 million representing a 54% increase over the second quarter of fiscal 2015.

- Non-GAAP gross margin for the second quarter of fiscal 2016 was 67.8% compared to 67.4% in the second quarter of fiscal 2015.

- Non-GAAP operating loss was $7.2 million or negative 9% of revenue for the second quarter of fiscal 2016, compared to a loss of $10.7 million or negative 20% of revenue in the second quarter of fiscal 2015.

- GAAP net loss for the second quarter of fiscal 2016 was $30.1 million, or $0.38 per basic and diluted share, compared with a net loss of $26.1 million, or $0.37 per basic and diluted share in the second quarter of fiscal 2015.

- Non-GAAP net loss for the second quarter of fiscal 2016 was $7.8 million, or $0.10 per basic and diluted share, compared with a net loss of $10.9 million, or $0.15 per basic and diluted share in the second quarter of fiscal 2015.

- Cash flow from operations was $14.9 million or 19% of revenue for the second quarter of fiscal 2016, compared to $2.8 million or 5% of revenue in the second quarter of fiscal 2015. Free cash flow was $9.0 million or 11% of revenue for the second quarter of fiscal 2016, compared to negative $1.3 million or negative 2% of revenue in the second quarter of fiscal 2015.

41.    In the August 25, 2015 press release, Defendant Vasudevan stated:

As the storage industry continues to experience disruption from architectural shifts, our core belief that only the Adaptive Flash Platform can consolidate and dynamically optimize every enterprise application running across the data center remains our guiding principle…Q2 provided clear evidence of our continuing momentum. We added 690 new customers, a new quarterly record, delivered a broad range of enterprise-grade capabilities with Nimble OS 2.3, and were recognized with two prestigious awards, an industry award for the most innovative flash memory technology and an IT professional innovation leader award for hybrid HDD/SSD arrays.

42.    Following the August 25, 2015 press release concerning the Company's financial results for the second fiscal quarter of 2016, Defendants Vasudevan and Singh held a conference call for analysts and investors.  During the August 25, 2015 conference call, Defendant Vasudevan stated, in pertinent part:

We added 690 customers during Q2, a record pace of customer acquisition compared to any previous quarter. We now have over 6,200 customers within our install base. Our channel continues to play a stellar role in helping us drive customer acquisition. We have over 1,000 unique channel sales reps that close deals during Q2. This channel leverage helps drive overall leverage in our business model.

The enhancements that we have made to our platform over the last 18 months are translating into continued strong enterprise momentum. During Q2, the number of deals we closed over $100,000 reached an all-time high. Our bookings over the last 12 months within the global 5,000 and the cloud service provider segment compared to the previous 12-month period were up by more than 80% in each segment. In just the global 500, we now have 70 customers as part of our install base. Fibre Channel remains a key contributor to our enterprise momentum.

*        *        *

Our focus on customer acquisition stems from a belief that as customers continue to experience data growth, that will in turn translate into sustained growth over many years for us so long as we can demonstrate very high customer satisfaction. This is where InfoSight remains unmatched and drives repeat deployments. On a trailing 12-month basis, repeat bookings

accounted for 46% of our total bookings as we continue to see a consistent pattern of repeat purchases within our customer base.

43.   At the August 25, 2015 conference call, Defendant Singh stated:

Moving on to guidance for Q3. In Q3, we expect our revenue to be in the range of $86 million to $88 million and operating losses between $5 million and $6 million. This translates into a non-GAAP loss of $0.08 to $0.09 per share, which is based on approximately 80 million shares outstanding. We remain on track to achieve our goal of breakeven in non-GAAP operating income at the end of FY16.

44.   On August 26, 2015, the Company's stock price closed at $26.72 per share, up approximately 11% from the day before when Defendants announced the Company's financial results for the second fiscal quarter of 2016.

## FALSE AND MISLEADING STATEMENTS

45.   The statements made by Defendants concerning the Company's financial results for the first and second fiscal quarters of 2016, detailed above, were false and misleading because Defendants failed to disclose material adverse information about the Company, which was known by Defendants. Such information included:

    a.   that the Company's decision to focus its sales efforts away from the small to medium-sized U.S. Commercial markets and instead on Large Enterprises sales channel reduced the amount of sales resources directed to the Company's traditional and successful U.S. Commercial market;

    b.   that as a result of the Company's decision to focus on the Large Enterprises sales channel, large competitor who had been and continue to be successful in the Large Enterprise channel slashed prices in order to maintain market share and as a result, the Company's sales to Large Enterprises were significantly lower than expected, continued to decline further as the competition increased, and caused the Company to lose sales to its traditional small and medium-sized operations;

    c.   that the Company's gross margins would be adversely effected by increased discounting of the Company's products in an effort to keep up with the large competitors; and

    d.   as a result of the foregoing, the Defendants' positive outlook and statements concerning the Company's financial results in the first and second fiscal quarters for 2016 were

materially false and misleading and lacked a reasonable basis for touting such prospects to the Company's shareholders and investing public.

46.   On November 19, 2015, the Company issued a press release announcing its financial results for the third fiscal quarter for 2016 for the period ended October 31, 2015.  The press release stated in pertinent part:

**Financial Highlights:**

- Total revenue increased 37% to $80.7 million, up from $59.1 million in the third quarter of fiscal 2015. Excluding fluctuations in foreign currency, revenue would have been $83.5 million representing a 41% increase over the third quarter of fiscal 2015.

- Non-GAAP gross margin for the third quarter of fiscal 2016 was 66.9% compared to 67.1% in the third quarter of fiscal 2015.

- Non-GAAP operating loss was $10.8 million or negative 13% of revenue for the third quarter of fiscal 2016, compared to a loss of $9.7 million or negative 16% of revenue in the third quarter of fiscal 2015.

- GAAP net loss for the third quarter of fiscal 2016 was $28.6 million, or $0.36 per basic and diluted share, compared with a net loss of $28.4 million, or $0.39 per basic and diluted share in the third quarter of fiscal 2015.

- Non-GAAP net loss for the third quarter of fiscal 2016 was $11.0 million, or $0.14 per basic and diluted share, compared with a net loss of $11.0 million, or $0.15 per basic and diluted share in the third quarter of fiscal 2015.

- Cash flow from operations was negative $3.1 million or 4% of revenue for the third quarter of fiscal 2016, compared to negative $6.5 million or 11% of revenue in the third quarter of fiscal 2015. Free cash flow was negative $12.2 million or 15% of revenue for the third quarter of fiscal 2016, compared to negative $11.5 million or negative 19% of revenue in the third quarter of fiscal 2015.

47.   In the November 19, 2015 press release, Defendant Vasudevan stated:

We have been executing a strategy of augmenting our customer base of mid-sized enterprises by focusing on expanding our presence in the large enterprise segment, while simultaneously aiming to achieve non-GAAP breakeven operating income in Q4FY16. Our Q3FY16 results fell short of our expectations for two reasons. First, we believe while we are acquiring large enterprise customers at a strong pace, our enterprise investments are taking longer to become fully productive. Second, we believe the shift in investment from commercial to enterprise business impacted our commercial revenue growth more than we anticipated…We continue to strongly believe that the market opportunity associated with the shift from disk-centric architectures to flash-centric architectures is significant, and that our Adaptive Flash platform offers the broadest and most differentiated approach to leveraging flash storage in the modern data center.

48.    On the same day, the Company issued the November 19, 2015 press release, Defendants Vasudevan and Singh held a conference call for analysts and investors concerning the Company's financial results for the third fiscal quarter 2016.  Defendant Vasudevan stated, in pertinent part:

Although our Q3 FY16 revenue grew 37% compared to Q3 FY15 and we executed well on many operational dimensions, our Q3 FY16 results fell short of our expectations.

We have been executing a strategy of augmenting our traditional customer base of mid-sized enterprises by focusing on large enterprises. At the same time, as we make this transformation, we have also been focused on achieving non-GAAP breakeven operating income in Q4 FY16 by balancing topline growth versus investments in the business.

Given the backdrop of a storage market that is extremely competitive, where storage vendors are investing heavily to defend market share, we now believe that this approach of constraining investments at the same time that we diversify our customer base may have impacted our growth. Specifically, there are two developments during the quarter with that we believe impacted us.

First, our investments in building out large enterprise customer base is making solid progress, but these investments are taking longer to get fully productive. Second, given an overall investment envelope, we shifted investments from our commercial segment to the large enterprise segment. This decreased investment affected areas such as the number of commercial teams and inside sales teams, demand generation programs, and channel incentives. We believe that this decreased investment led to slower growth than we would have seen, had we maintained our previous pace of investment.

*       *       *

There are really three changes that impacted us. One is, when we look at a mix of teams that we have brought on board, over half of the teams in the last four quarters have been non-commercial teams, named account teams. So number of sales teams we are adding is lower in the commercial segment than traditionally has been true. That is the first thing.

The second one, which has even a more short-term impact, is we have a lot of marketing programs, channel programs, aimed at opportunity generation, and these are fairly short-cycle opportunity generation. Typically, a 75 to 90-day cycle in which they convert, and so we pulled investments from both marketing and channel, or shifted investments toward larger enterprise wins rather than commercial wins. Both of those are the investments that we intend to go back and add again in our business model.

*       *       *

Marketing with inside sales, that's one. And the third one is channel programs. So, we have about half of our opportunities are marketing sourced, another half of our opportunities are channel sourced.

*       *       *

AARON RAKERS: Okay, and final question for me. On the enterprise productivity, I'm just curious, where do we stand on the productivity curve, maybe relative to what you would have thought of maybe coming out of the July quarter? And as you bring on these new named account teams, just remind us again how long it takes us to see them ramp to that kind of targeted productivity?

SURESH VASUDEVAN: Yes, so I think we have not actually giving you specifics on the past. Let me just say, what we have said in the past is typically our commercial teams, Aaron, take around four quarters before they are on the same curve as our mature teams. Enterprise teams, we had said were slightly longer than that.

What we're now seeing is that full productivity of our enterprise teams is perhaps four quarters longer than our commercial teams, and that's really how we are seeing this. It takes about a couple of years before enterprise teams yield the kind of full productivity that we are looking for.

49.   At the November 19, 2015 conference call, Defendant Singh stated, in pertinent part:

Moving on to guidance and our thoughts for Q4. Over the past year, we have been performing a balancing act of growing our base of mid-sized enterprises, as well as increasing our focus on the large enterprise segment. At the same time, we have also been focused in getting to breakeven and non-GAAP operating income in Q4 through the balancing of topline growth with investments in the business.

We now believe this strategy of threading the investment needle at a time when the storage industry is competitive as it is may have impacted our growth. We are making some key changes that we believe will drive higher growth in the future However, there will be some time before these benefits are realized.

We have accounted for these factors that caused a slowing of growth during Q3 in setting our expectations for Q4. In Q4, we expect our revenue to be in the range of $87 million to $90 million, and operating losses between $8 million and $10 million. This translates into a non-GAAP loss of $0.11 to $0.13 a share, which is based upon approximately 81 million shares outstanding.

*      *      *

JOHN ROY, ANALYST, UBS: Hi, it's John Roy, in for Steve. Quickly, on your profitability. Obviously it's not going to come next quarter. Do you have any type of color you can give us on when it might be? Also, Anup, are you still saying a 3x to 4x advantage in pricing even though -- with the discounting?

ANUP SINGH: So, John, this is Anup. On the question of getting to profitability. The way we think about it is, the investments we have talked with the first half of the year for next year is going to lead to a decrease in leverage, as compared to margins of this year. So if you compare first half to first half, you'll see a decrease in leverage.

We expect, however, the investment that we're making, that Suresh articulated, will have an impact starting the second half of next year, and therefore we should get back to showing an improvement in leverage in the model in the second half of next year, as compared to the second half of this year. Apart from that, at this stage, we are not offering up any guidance in terms of the long term sort of breakeven or the path profitability.

## DAMAGES TO THE COMPANY

50.   Defendants made or caused to be made materially false or misleading statements about

Nimble Storage's business, products and operations.  These material misstatements and omissions had

the cause and effect of creating in the market an unrealistically positive assessment of Nimble Storage,

thus causing the Company's common stock to be overvalued and artificially inflated during the Relevant Period.

51.     After the Defendants false and misleading statements became public knowledge the Company's stock price plummeted, causing the Company and its shareholders to be harmed and continue to be harmed.  Defendants false and misleading statements included that Nimble Storage: (i) was being competitively priced-out of the market in selling its products to Large Enterprises by large competitors who reduced their prices in order to retain market share; (ii) had made a conscious decision to change its sales and operations strategy in order to focus its efforts toward selling its new products in the large enterprises market and thereby reduce sales efforts in the U.S. commercial market; and (iii) was losing sales in both sales channels due to the change in sales strategy and price competition from large competitors.

52.     On this news, the Company's stock dropped $10.34 per share, approximately 51%, from $20.39 on November 19, 2015, to close at $10.05 per share on November 20, 2015.

53.     As a direct and proximate result of the Defendants' misconduct in issuing false and misleading statements, Nimble Storage has been, and will continue to be, severely damaged and injured.  Such harm includes, but is not limited to:

    a.   Costs incurred in compensation and benefits paid to Defendants that breached their duties to the Company;

    b.   Substantial loss of market capital;

    c.   Costs already incurred defending against the pending securities class actions and potential liability therefrom; and

    d.   Nimble Storage's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.

54.     The actions complained of herein have irreparably damaged Nimble Storage's corporate image and goodwill.  For at least the foreseeable future, Nimble Storage will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Nimble Storage's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DEFENDANTS' INSIDER SALES**

55.   After the false and misleading statements made in the Company's SEC filings and press releases during the Relevant Period and while Defendants were in possession of material, adverse, non-public information, Defendants Vasudevan, Mehta, Kennelly, Li, Singh, Leary and Maheshwari (the "Insider Selling Defendants") took advantage of Nimble Storage's artificially inflated stock price and sold portions of their holdings in Nimble Storage at artificially inflated stock prices.[4]

56.   During the Relevant Period, Defendant Vasudevan sold 135,641 shares, timed to closely follow the May 26, 2015 and August 25, 2015 false and misleading quarterly filings, at artificially inflated prices for total proceeds of $3,510,395.  Defendant Vasudevan's sales during the Relevant Period are as follows:

| Defendant Vasudevan | | | | |
|---|---|---|---|---|
| **Sale Date** | **# Shares Sold** | **Price Per Share** | **Proceeds** | **Remaining Holdings** |
| July 1, 2015 | 32,600 | $27.90 | $909,540 | 930,058 |
| July 2, 2015 | 17,400 | $27.57 | $479,718 | 930,058 |
| September 3, 2015 | 10,651 | $25.32 | $269,683 | 919,407 |
| September 3, 2015 | 22,049 | $24.93 | $549,682 | 919,507 |
| September 3, 2015 | 100 | $25.60 | $2,560 | 919,407 |
| September 4, 2015 | 27,851 | $24.42 | $680,121 | 919,407 |
| September 11, 2015 | 4,168 | $24.96 | $104,033 | 915,239 |
| September 11, 2015 | 9,428 | $25.07 | $236,360 | 905,811 |
| September 14, 2015 | 7,900 | $25.38 | $200,502 | 897,911 |
| October 1, 2015 | 3,494 | $22.38 | $78,196 | 894,417 |

57.   During the Relevant Period, Defendant Mehta sold 465,490 shares, timed to closely follow the May 26, 2015 and August 25, 2015 false and misleading quarterly filings, at artificially inflated prices for total proceeds of $13,371,793.  Defendant Mehta's sales during the Relevant Period are as follows:

---

[4] In certain instances, in the following charts detailing each Insider Selling Defendant's remaining holdings, certain Defendants sold a number of their shares and acquired more shares the same day pursuant to "Employee Stock Option (Right to Buy)" agreements with the Company.

| Defendant Mehta | | | | |
|---|---|---|---|---|
| Sale Date | # Shares Sold | Price Per Share | Proceeds | Remaining Holdings |
| June 3, 2015 | 7,693 | $25.64 | $197,249 | 4,349,100 |
| June 9, 2015 | 66,130 | $29.00 | $1,917,770 | 668,486 |
| June 10, 2015 | 18,486 | $29.00 | $536,094 | 650,000 |
| June 10, 2015 | 253,846 | $29.00 | $7,361,534 | 4,095,254 |
| June 10, 2015 | 84,616 | $29.00 | $2,453,864 | 650,000 |
| July 8, 2015 | 4,166 | $26.54 | $110,566 | 4,091,088 |
| July 22, 2015 | 4,167 | $27.81 | $115,884 | 4,086,921 |
| July 23, 2015 | 2,800 | $29.00 | $81,200 | 4,084,121 |
| August 7, 2015 | 4,167 | $26.22 | $109,259 | 4,079,954 |
| August 21, 2015 | 2,600 | $25.05 | $65,130 | 4,077,354 |
| August 24, 2015 | 100 | $25.00 | $2,500 | 4,077,254 |
| August 26, 2015 | 300 | $25.34 | $7,602 | 4,076,954 |
| August 26, 2015 | 1,166 | $26.42 | $30,806 | 4,075,788 |
| September 3, 2015 | 1,610 | $25.19 | 40,556 | 383,667 |
| September 8, 2015 | 4,167 | $25.51 | $106,300 | 4,071,621 |
| September 11, 2015 | 9,476 | $24.85 | $235,479 | 374,191 |

58.    During the Relevant Period, Defendant Kennelly sold 15,324 shares, timed to closely follow the May 26, 2015 and August 25, 2015 false and misleading quarterly filings, at artificially inflated prices for total proceeds of $408,154.  Defendant Kennelly's sales during the Relevant Period are as follows:

| Defendant Kennelly | | | | |
|---|---|---|---|---|
| Sale Date | # Shares Sold | Price Per Share | Proceeds | Remaining Holdings |
| June 1, 2015 | 5,000 | $25.88 | $129,400 | 85,000 |
| June 2, 2015 | 2,662 | $25.46 | $67,775 | 7,986 |
| June 11, 2015 | 2,662 | $29.50 | $78,529 | 5,324 |
| September 1, 2015 | 5,000 | $26.49 | $132,450 | 80,000 |

59.    During the Relevant Period, Defendant Li sold 52,000 shares, timed to closely follow the May 26, 2015 and August 25, 2015 false and misleading quarterly filings, at artificially inflated prices for total proceeds of $1,485,828.  Defendant Li's sales during the Relevant Period are as follows:

| Defendant Li | | | | |
|---|---|---|---|---|
| **Sale Date** | **# Shares Sold** | **Price Per Share** | **Proceeds** | **Remaining Holdings** |
| June 16, 2015 | 22,300 | $30.65 | $683,495 | 286,550 |
| June 16, 2015 | 3,700 | $31.19 | $115,403 | 282,850 |
| September 1, 2015 | 26,000 | $26.42 | $686,920 | 256,850 |

60.   During the Relevant Period, Defendant Leary sold 232,418 shares, timed to closely follow the May 26, 2015 and August 25, 2015 false and misleading quarterly filings, at artificially inflated prices for total proceeds of $6,616,262.  Defendant Leary's sales during the Relevant Period are as follows:

| Defendant Leary | | | | |
|---|---|---|---|---|
| **Sale Date** | **# Shares Sold** | **Price Per Share** | **Proceeds** | **Remaining Holdings** |
| June 16, 2015 | 93,000 | $30.90 | $2,873,700 | 213,992 |
| June 18, 2015 | 4,400 | $30.34 | $133,496 | 216,592 |
| June 18, 2015 | 2,600 | $31.03 | $80,678 | 213,992 |
| June 18, 2015 | 15,300 | $30.32 | $463,896 | 344,700 |
| June 18, 2015 | 8,700 | $31.03 | $296,961 | 336,000 |
| July 20, 2015 | 6,100 | $27.50 | $167,750 | 214,892 |
| July 20, 2015 | 900 | $28.39 | $25,551 | 213,992 |
| July 20, 2015 | 21,200 | $27.51 | $583,212 | 330,126 |
| July 20, 2015 | 2,800 | $28.42 | $79,576 | 327,326 |
| August 18, 2015 | 7,000 | $26.33 | $184,310 | 213,992 |
| August 18, 2015 | 24,000 | $26.32 | $631,680 | 303,326 |
| September 3, 2015 | 3,544 | $25.34 | $89,805 | 210,448 |
| September 9, 2015 | 395 | $25.34 | $10,088 | 210,448 |
| September 11, 2015 | 7,267 | $25.13 | $182,620 | 203,181 |
| September 11, 2015 | 10,212 | $25.13 | $256,628 | 192,969 |
| September 25, 2015 | 9,900 | $24.37 | $241,263 | 293,426 |
| September 25, 2015 | 100 | $24.98 | $2,498 | 293,326 |
| October 19, 2015 | 5,000 | $22.63 | $113,150 | 192,969 |
| October 19, 2015 | 10,000 | $22.64 | $226,400 | 283,326 |

61.   During the Relevant Period, Defendant Singh sold 37,652 shares, timed to closely follow the May 26, 2015 and August 25, 2015 false and misleading quarterly filings, at artificially inflated prices for total proceeds of $989,686.  Defendant Singh's sales during the Relevant Period are as follows:

| **Defendant Singh** | | | | |
|---|---|---|---|---|
| **Sale Date** | **# Shares Sold** | **Price Per Share** | **Proceeds** | **Remaining Holdings** |
| June 1, 2015 | 5,000 | $25.59 | $127,950 | 190,789 |
| June 15, 2015 | 2,709 | $30.00 | $81,270 | 188,080 |
| June 15, 2015 | 2,291 | $30.00 | $68,730 | 346,446 |
| July 1, 2015 | 5,000 | $28.21 | $141,050 | 341,446 |
| August 3, 2015 | 5,000 | $27.03 | $135,150 | 345,584 |
| September 1, 2015 | 5,000 | $26.57 | $132,850 | 335,584 |
| September 3, 2015 | 803 | $25.31 | $20,324 | 190,475 |
| September 9, 2015 | 731 | $25.50 | $18,641 | 190,475 |
| September 11, 2015 | 6,118 | $24.84 | $151,971 | 184,357 |
| October 1, 2015 | 5,000 | $22.35 | $111,750 | 330,584 |

62.    During the Relevant Period, Defendant Maheshwari sold 182,969 shares, timed to closely follow the May 26, 2015 and August 25, 2015 false and misleading quarterly filings, at artificially inflated prices for total proceeds of $5,083,388.  Defendant Maheshwari's sales during the Relevant Period are as follows:

| **Defendant Maheshwari** | | | | |
|---|---|---|---|---|
| **Sale Date** | **# Shares Sold** | **Price Per Share** | **Proceeds** | **Remaining Holdings** |
| May 27, 2015 | 4,400 | $25.65 | $112,860 | 4,257,217 |
| May 27, 2015 | 1,600 | $26.21 | $41,936 | 4,255,617 |
| May 28, 2015 | 6,000 | $26.17 | $157,020 | 4,249,617 |
| May 27, 2015 | 1,600 | $25.68 | $41,088 | 1,150,400 |
| May 27, 2015 | 400 | $26.41 | $10,564 | 1,150,000 |
| May 28, 2015 | 2,000 | $26.17 | $52,340 | 1,148,000 |
| June 3, 2015 | 6,000 | $26.22 | $157,320 | 4,243,617 |
| June 4, 2015 | 6,000 | $26.69 | $160,140 | 4,237,617 |
| June 3, 2015 | 2,000 | $26.21 | $52,420 | 1,146,000 |
| June 4, 2015 | 2,000 | $26.69 | $53,380 | 1,144,000 |
| June 10, 2015 | 6,000 | $29.46 | $176,760 | 4,231,617 |
| June 10, 2015 | 2,000 | $29.47 | $58,940 | 1,142,000 |
| June 11, 2015 | 6,000 | $29.05 | $174,300 | 4,225,617 |
| June 11, 2015 | 2,000 | $29.06 | $58,120 | 1,140,000 |
| June 17, 2015 | 5,800 | $31.64 | $183,512 | 4,219,817 |
| June 17, 2015 | 200 | $32.08 | $6,416 | 4,219,617 |
| June 18, 2015 | 3,800 | $30.32 | $115,216 | 4,215,817 |
| June 18, 2015 | 2,200 | $31.04 | $68,288 | 4,213,617 |
| June 17, 2015 | 2,000 | $31.65 | $63,300 | 1,138,000 |
| June 18, 2015 | 1,200 | $30.28 | $36,336 | 1,136,800 |

| June 18, 2015 | 800 | $31.03 | $24,824 | 1,136,000 |
|---|---|---|---|---|
| June 24, 2015 | 6,000 | $30.09 | $180,540 | 4,207,617 |
| June 24, 2015 | 2,000 | $30.10 | $60,200 | 1,134,000 |
| June 25, 2015 | 6,000 | $30.19 | $181,140 | 4,201,617 |
| June 25, 2015 | 2,000 | $30.18 | $60,360 | 1,132,000 |
| July 1, 2015 | 2,000 | $27.89 | $55,780 | 1,130,000 |
| July 1, 2015 | 6,000 | $27.90 | $167,400 | 4,195,617 |
| July 2, 2015 | 2,000 | $27.54 | $55,080 | 1,128,000 |
| July 2, 2015 | 6,000 | $27.56 | $165,360 | 4,189,617 |
| July 8, 2015 | 400 | $27.15 | $10,860 | 4,189,217 |
| July 8, 2015 | 100 | $27.08 | $2,708 | 1,127,900 |
| July 15, 2015 | 200 | $27.01 | $5,402 | 4,189,017 |
| July 16, 2015 | 23,400 | $27.13 | $634,842 | 4,165,617 |
| July 15, 2015 | 100 | $27.00 | $2,700 | 1,127,800 |
| July 16, 2015 | 7,800 | $27.12 | $211,536 | 1,120,000 |
| July 22, 2015 | 6,000 | $27.84 | $167,040 | 4,159,617 |
| July 22, 2015 | 2,000 | $27.86 | $55,720 | 1,118,000 |
| July 23, 2015 | 6,000 | $28.47 | $170,820 | 4,153,617 |
| July 23, 2015 | 2,000 | $28.47 | $56,940 | 1,116,000 |
| July 29, 2015 | 100 | $27.00 | $2,700 | 1,115,900 |
| July 29, 2015 | 300 | $27.34 | $8,202 | 4,153,317 |
| July 30, 2015 | 11,700 | $27.04 | $316,368 | 4,141,617 |
| July 30, 2015 | 3,900 | $27.04 | $105,456 | 1,112,000 |
| August 5, 2015 | 6,000 | $27.24 | $163,440 | 4,135,617 |
| August 5, 2015 | 2,000 | $27.22 | $54,440 | 1,110,000 |
| August 6, 2015 | 800 | $27.21 | $21,768 | 1,109,200 |
| August 6, 2015 | 2,400 | $27.21 | $65,304 | 4,133,217 |
| August 26, 2015 | 300 | $27.03 | $8,109 | 4,132,917 |
| August 26, 2015 | 300 | $27.04 | $8,112 | 1,108,900 |
| September 3, 2015 | 1,649 | $24.65 | $40,648 | 4,131,268 |
| September 11, 2015 | 9,520 | $25.14 | $239,333 | 4,121,748 |

63.    These insider sales were executed under highly suspicious circumstances and while the Insider Selling Defendants possessed material, adverse, non-public Company information.

64.    Indeed, because of their roles as directors of Nimble Storage during the Relevant Period, the Insider Selling Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, non-public information about the business of Nimble Storage.

65.    Thus, the Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse non-public information concerning Nimble Storage's financial and business prospects.

## DEFENDANTS' DUTIES

66.    By reason of their positions as directors and/or officers of Nimble Storage and because of their ability to control the business and corporate affairs of Nimble Storage, the Individual Defendants owed Nimble Storage and its shareholders fiduciary obligations of good faith, loyalty, and candor, and care and were and are required to use their utmost ability to control and manage Nimble Storage in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Nimble Storage and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Nimble Storage and its shareholders the fiduciary duty to exercise good faith, loyalty, diligence, and care in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

67.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Nimble Storage, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Nimble Storage, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

68.    To discharge their duties, the Board of Nimble Storage was required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the directors of Nimble Storage were required to, among other things:

a.    Exercise good faith, loyalty, and care to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.    Exercise good faith, loyalty, and care to ensure that the Company was operated in a prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c.   Exercise good faith, loyalty, and care to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    d.   When put on notice of problems with the Company's business practices and operations, exercise good faith and loyalty in taking appropriate action to correct the misconduct and prevent its recurrence.

69.    By reason of their position as directors and officers of the Company, the Defendants are obligated to refrain from insider trading.

70.    Pursuant to the Company's "Code of Business Conduct and Ethics – Directors[5]," "[d]irectors are not permitted to use or share 'inside' or material non-public information for stock trading purposes or for any other purpose except the conduct of our business."

71.    Pursuant to the Company's "Code of Business Conduct and Ethics – Employees[6]," which applies to all employees of Nimble Storage, "[e]mployees who have access to 'inside' or material non-public information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business."

72.    In addition, Defendants Calderoni, Jenkins and Schroeder, as members of the Audit Committee, were under specific duties incorporated by the Company into its Audit Committee Charter as adopted September 25, 2013.

73.    The Audit Committee Charter states that the "purpose of the Audit Committee…is to assist the Board in fulfilling its oversight responsibilities relating to the Company's financial accounting, reporting and controls."  In particular, the Audit Committee's principal functions are to assist the Board in its oversight of:

---

[5] *See* Nimble Storage, Inc., *Code of Business Conduct and Ethics for Directors*, adopted by the Board of Directors on September 25, 2013, *available at* http://s1.q4cdn.com/994352327/files/doc_downloads/Code_of_Business_Conduct_and_Ethics_-_Directors.pdf.

[6] *See* Nimble Storage, Inc., *Code of Business Conduct and Ethics*, adopted by the Board of Directors on September 25, 2013, *available at* http://s1.q4cdn.com/994352327/files/doc_downloads/Code_of_Business_Conduct_and_Ethics-Employees.pdf.

- the integrity of accounting and financial reporting processes of the Company and the audits of the Company's financial statements by the Company's independent auditors;

- the periodic reviews of the adequacy of the accounting and financial reporting processes and systems of internal control that are conducted by the Independent Auditors and the Company's financial and senior management;

- the performance of the Company's internal audit function; and

- compliance by the Company with legal and regulatory requirements.

74.  Under the Audit Committee Charter, the Audit Committee, the Audit Committee members are required to, among other things:

(1) Review and discuss with management the Company's quarterly results and the related earnings press release prior to distribution to the public and periodically discuss on a general basis with management the type of information to be disclosed and the type of presentation to be made regarding released financial information;

(2) Review the Company's quarterly and annual financial statements;

(3) Review the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

(4) Discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies, judgments or estimates with the Company's management and the Independent Auditors;

(5) Review the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

(6) Review and discuss with the Independent Auditors and the Company's management their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including any significant deficiencies and material weaknesses in their design or operation; and

(7) Review any fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

75.  A pre-suit demand on the Nimble Storage Board is futile, and therefore, excused because a majority of the directors are not impartial to consider the demand for the reasons detailed below.

76.  The Board of Nimble Storage consists of the following eight individuals: Defendants Vasudevan, Mehta, Kennelly, Li, Calderoni, Goetz, Jenkins, and Schroeder.

**Demand is Futile as to Defendant Vasudevan Because his Principal**

**Professional Occupation is as the Company's CEO**

77.    Defendant Vasudevan has been a director of the Nimble Storage since 2009 and the Company's CEO since 2011.  In his role as CEO of the Company for the years ended January 31, 2015 and 2014, Defendant Vasudevan received $6,847,985 and $6,571,822 in total compensation,[7] respectively.  The Company does not claim that Defendant Vasudevan is an independent director and because Defendant Vasudevan's primary source of income and primary employment is, his employment as CEO of Nimble Storage and his professional reputation is inextricably bound to his role at Nimble Storage, Defendant Vasudevan is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to Defendant Mehta Because his Principal**

**Professional Occupation is as the Company's CEO**

78.    Defendant Mehta is one of the two founders of the Company, has been a director of the Company since 2007 and was the CEO of Nimble Storage from November 2007 until March 2011, when Defendant Mehta became the Vice President of Engineering.  In his role as Vice President of Engineering of the Company for the years ended January 31, 2015 and 2014, Defendant Mehta received $12,465,372 and $753,703 in total compensation[8], respectively.  The Company does not claim that Defendant Mehta is an independent director and because Defendant Mehta's primary source of income and primary employment is, his employment as Vice President of Engineering of Nimble Storage and his professional reputation is inextricably bound to his role at Nimble Storage, Defendant Mehta is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to the Insider Selling Defendants**

**Who Face a Substntial Likelihood of Liability**

79.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management

---

[7] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.
[8] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

and the Board meetings during the Relevant Period, each of the Insider Selling Defendants –
Vasudevan, Mehta, Kennelly, Li, Singh, Leary and Maheshwari – knew the adverse non-public
information regarding the Company's decision to focus its sales efforts away from the small to
medium-sized U.S. Commercial markets and instead on Large Enterprises sales channel and how that
negatively impacted the Company's sales and would negatively impact future sales.  While in
possession of this material adverse non-public information regarding the Company, the Insider Selling
Defendants participated in the illegal insider selling and thereby received personal financial benefits
from the challenged insider trading transactions. Specifically:

(i)      During the Relevant Period, Defendant Vasudevan sold 135,641 shares of Nimble Storage
stock for $3,510,395;

(ii)     During the Relevant Period, Defendant Mehta sold 465,490 shares of Nimble Storage stock
for $13,371,793;

(iii)    During the Relevant Period, Defendant Kennelly sold 15,324 shares of Nimble Storage
stock for $408,154;

(iv)    During the Relevant Period, Defendant Li sold 52,000 shares of Nimble Storage stock for
$1,485,828;

(v)     During the Relevant Period, Defendant Singh sold 37,652 shares of Nimble stock for
$989,686;

(vi)    During the Relevant Period, Defendant Leary sold 232,418 shares of Nimble stock for
$6,616,262; and

(vii)   During the Relevant Period, Defendant Maheshwari sold 182,969 shares of Nimble stock
for $5,083,388.

80.     During the Relevant Period, the Insider Selling Defendants (Vasudevan, Mehta,
Kennelly, Li, Singh, Leary and Maheshwari) sold shares of Nimble Storage stock while they were in
possession of material, adverse, nonpublic information, during a time in which Nimble Storage stock
was artificially inflated as a result of the Defendants' misconduct.  Moreover, in making or causing
these sales, the Insider Selling Defendants violated the Company's insider trading policies as set forth
in the Company's Codes of Business Conduct and Ethics for Directors and Employees.

81.    As a result of these illicit insider sales, Individual Defendants Vasudevan, Mehta, Kennelly and Li, as insiders and Board members who sold shares of the Company during the Relevant Period, each received direct financial benefits not shared with Nimble Storage shareholders, and have breached their fiduciary duties of loyalty and good faith and therefore, each face a sufficiently substantial likelihood of liability rendering demand upon them futile.

**Demand is Futile as to Defendants Kennelly, Li and Mehta as Managers**
**and/or Partners in Accel and its Entities**

82.    Defendants Kennelly, Li and Mehta have been Partners and/or Managers of Accel Partners ("Accel") and entities[9] affiliated with Accel since the Company was founded and continuously through the Company's IPO on December 13, 2013.

83.    Defendant Li is a Managing Member of Accel Growth Fund II Associates L.L.C., Accel Growth Fund Investors 2012 L.L.C., Accel Investors 2007 L.L.C. and Accel IX Associates L.L.C. Defendant Mehta is a limited Partner in Accel Growth Fund II Strategic Partners L.P. and Defendant Kennelly is a general Partner of Kennelly Partners, L.P. ("Kennelly Partners"), which is a limited Partner in Accel Growth Fund II Strategic Partners L.P. and Accel IX Strategic Partners L.P.

84.    Accel and its entities comprised part of investor group that executed the Amended and Restated Investors Rights Agreement, dated August 10, 2012 (the "Investor Rights Agreement"), among the Company and certain of its stockholders, as amended.[10]

85.    As Managing Members and/or Partners in Accel and its entities, Defendants Kennelly, Li and Mehta have interests that are not aligned with shareholders of Nimble Storage as their interests have been with that of Accel since Accel invested in Nimble Storage in the initial rounds of funding prior to the Company's IPO.  These investors pursued the IPO in order for a way to liquidate their holdings in the Company.

[9] Includes Accel Growth Fund II L.P., Accel Growth Fund II Strategic Partners L.P., Accel Growth Fund Investors 2012 L.L.C., Accel Investors 2007 L.L.C., Accel IX L.P., Accel IX Strategic Partners L.P. and Accel Growth Fund II Associates L.L.C.

[10] *See* Form S-1, Ex. 4.2, filed on October 18, 2013.

86.     As such, demand is futile as to Defendants Kennelly, Li and Mehta because of their interest in Accel as opposed to that of the Company and its shareholders.

87.     In addition, Defendants Kennelly, Li and Mehta, as Managing Members and/or Partners in Accel and its entities, caused Accel, the Company's largest shareholder, to sell its holdings in the Company.

88.     Before the IPO, Accel beneficially owned 20.8% of the Company's outstanding shares and was the largest shareholder.  After the IPO, Accel was still the Company's largest shareholder and beneficially owned 18.4% of the Company's outstanding shares.  Because Defendant Li is a Managing Member of several entities affiliated with Accel, Defendant Li beneficially owned the same percentage of shares as Accel.

89.     As of the 2014 Proxy, Accel and its entities beneficially owned 12,940,220 shares of the Company's stock, or approximately 18%, and, as a result of his role as a Managing Member of Accel, Defendant Li also beneficially owned 18% of the Company's outstanding shares.

90.     Between the time the Company filed the 2014 Proxy and the 2015 Proxy, Defendants Li, Mehta and Kennelly, caused Accel to sell its holdings in the Company.  By May 29, 2015, Accel and its entities beneficially owned less than 5% of the Company's outstanding shares.

91.     Because Defendants Kennelly, Li and Mehta have been Managing Members and/or Partners with Accel and its entities since the Company's initial round of funding and through the Company's IPO and have maintained longstanding business relationships, demand is futile as to Defendants whose interests are aligned with Accel, rather than that of the Company and its shareholders.

**Demand is Futile as to Defendants Calderoni, Jenkins and**
**Schroeder as Members of the Audit Committee**

92.     Defendants Calderoni, Jenkins and Schroeder (the "Audit Committee Defendants") are interested and unable to consider demand because they each face a substantial likelihood of liability for their conduct as Audit Committee members in failing to make sure the Company's public filings were not materially false and misleading.

93.     Nimble Storage's Audit Committee Charter requires that the members of the Audit Committee are responsible for "review[ing] the Company's quarterly and annual financial statements." The Audit Committee Defendants failed to properly review the Company's quarterly financial reports for the first and second fiscal quarters of 2016 in order to make sure the statements released by the Company were accurate and not materially false and misleading, as detailed above.

94.     Furthermore, the Audit Committee Defendants were responsible for "review[ing] any fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee," including the statements by Defendant Vasudevan and Mr. Singh in the Company's quarterly financial reports leading investors to believe the Company's prospects were significantly better than the actual reports and conference calls described.

95.     By issuing false and misleading statements and/or failing to disclose accurate material information concerning the Company in its required quarterly reports, the Audit Committee violated their fiduciary duty under Delaware law and the Company's Audit Committee Charter.  As such, demand is futile as to the Audit Committee Defendants.

96.     In breach of these specific obligations, the Audit Committee Defendants either failed to conduct the requisite reviews or conducted only a cursory, perfunctory review of the financial statements and press releases of Nimble Storage.  As a result, the Audit Committee Defendants acted in bad faith and abdicated their fiduciary duties when they approved the issuance of the false and misleading statements concerning the Company's sales to Large Enterprises and its traditional U.S. Commercial channel.

97.     Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breaches of their fiduciary duties of loyalty, candor and good faith.  Any demand upon Defendants Calderoni, Jenkins and Schroeder is futile.

## COUNT I

### **Breach of Fiduciary Duty of Loyalty Against the Individual Defendants**

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.    Each member of Nimble Storage's Board owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nimble Storage's business and affairs, particularly with respect to issues so fundamental as compliance with laws and regulation and regulatory body and shareholder reporting.

100.   The Individual Defendants' conduct set forth herein was due to their knowing breach of the fiduciary duties and the duty of loyalty they owed to the Company.  The Individual Defendants were aware of and participated in Nimble Storage's failure to disclose material information and making of false and misleading statements to the SEC, investors, and the general public.  In this fashion, Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Nimble Storage.

101.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nimble Storage has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### Breach of Fiduciary Duty of Care Against the Individual Defendants

102.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.   Each member of Nimble Storage's Board owes and owed to the Company the duty to exercise due care and diligence to the Company.  The Individual Defendants breached their fiduciary duty of care by failure to reasonably investigate under the circumstances.

104.   The Individual Defendants needed to make a sound and reasonable judgment regarding the the public statements and information provided to shareholders.

105.   Nimble Storage, its directors and/or certain of its executive officers are charged with failing to disclose material information during the Relevant Period, violating their fiduciary duties to the Company and its shareholders.  These material omissions and false statements, include, that Nimble Storage: (i) was being negatively impacted by intense competition from well-entrenched, large competitors who were slashing prices in order to maintain market share; (ii) had made a conscious decision to focus its sales and marketing efforts towards the large enterprises market and to reduce

1 | sales efforts in the U.S. commercial market; and (iii) was losing sales in both sales channels due to this

2 | change in sales strategy and the intense price competition.

3 |    106.   The Individual Defendants did not act in the best interest of the Company when it failed

4 | to provide accurate information to the general public or failed to disclose certain material information.

5 |    107.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary

6 | obligations, Nimble Storage has sustained and continues to sustain significant damages.  As a result of

7 | the misconduct alleged herein, Defendants are liable to the Company.

8 | **COUNT III**

9 | **Breach of Fiduciary Duty Against the Insider Selling Defendants**

10 |    108.   Plaintiff incorporates by reference and realleges each and every allegation contained

11 | above, as though fully set forth herein.

12 |    109.   At the time of the stock sales set forth herein, the Insider Selling Defendants –

13 | Defendants Kennelly, Ping Li, Mehta, Vasudevan, Singh, Leary and Maheshwari – were in possession

14 | of material, adverse, non-public information described above, and sold Nimble Storage common stock

15 | on the basis of such information.

16 |    110.   The information described above was proprietary, non-public information concerning the

17 | Company's financial condition and future business prospects.  It was a proprietary asset belonging to

18 | the Company that the Insider Selling Defendants used for their own benefit or for the benefit of an

19 | entity they controlled when they sold Nimble Storage common stock.

20 |    111.   At the time of their stock sales, the Insider Selling Defendants knew the material

21 | adverse, non-public information alleged above. The Insider Selling Defendants knew the Company's

22 | touted financial and business prospects were materially false and misleading at all relevant times

23 | during the Relevant Period.

24 |    112.   The Insider Selling Defendants' stock sales while in possession and control of this

25 | material adverse, non-public information constituted breaches of their fiduciary duties of loyalty and

26 | good faith and/or an unlawful misappropriation of Company information.

27

28

113.   Since the use of the Company's proprietary information for their own gain constitutes breaches of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

114.   Plaintiff, on behalf of Nimble Storage, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of Nimble Storage and that Plaintiff is an adequate representative of the Company;

B.   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Nimble Storage;

C.   Declaring that the Insider Selling Defendants disgorge profits earned as a result of the illicit insider trading scheme deployed by the Insider Selling Defendants throughout the Relevant Period;

D.   Determining and awarding to Nimble Storage the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

E.   Directing Nimble Storage and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures, including, but not limited to the appointment of an independent panel of three outside directors to investigate and report upon the above described payments and to issue a report thereon with recommendations for revised compensation procedures and standards to prevent such payments in the future;

F.   Determining and awarding to Nimble Storage exemplary damages in an amount necessary to punish the Defendants and to make an example of Defendants to the community according to proof at trial;

G.   Awarding Nimble Storage restitution from each of the Defendants;

H.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I.  Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:      February 23, 2016                    **REICH RADCLIFFE & HOOVER LLP**

By: /s/ Marc G. Reich
Marc G. Reich
Adam T. Hoover

**LIFSHITZ & MILLER**

Joshua M. Lifshitz
Edward Miller

Attorneys for Plaintiff